[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: DEFENDANT'S MOTION TO MODIFY CUSTODY (#139), PLAINTIFF'S MOTION TO MODIFY CUSTODY (#144.50), CT Page 11641 PLAINTIFF'S MOTION FOR CONTEMPT(#144), DEFENDANT'S MOTION FOR CONTEMPT (#146), DEFENDANT'S MOTION TO SUSPEND VISITATION (#151), PLAINTIFF'S MOTION FOR CONTEMPT (#152), AND MOTION BY COUNSEL, FOR MINOR CHILDREN FOR RETAINER (#153)
Many of the facts that give rise to the above motions are not in dispute.
The marriage between the parties was dissolved on August 18, 1994. There are two minor children at issue of the marriage, Kristen Marie Popolizio born February 9, 1983 and William Michael Popolizio (hereinafter referred to as B.J.) born July 10, 1986. On the date of the uncontested dissolution on August 18, 1994 the parties entered in to a stipulation coded 121 that provided for the plaintiff and the defendant to have joint legal custody of the parties' two minor children with the plaintiff having physical custody of the two children subject to the right of the defendant to liberal visitation with the children. On May 7, 1996 the parties entered into an agreement coded 135.50 modifying the visitation schedule. That agreement provided in part as follows:
 1. The plaintiff and defendant shall have joint legal custody and joint physical custody of their two (2) minor children, namely Kristen Marie born February 9, 1983, and William Michael, born July 10, 1986. It is presently contemplated that the children will alternate spending time in physical custody of their parents according the following schedule which is intended to be flexible in order to suite the needs and requirements of the children and to accommodate any changes in plans or school or work schedules. Said schedule is not intended to limit time spent together between the plaintiff and the children and the defendant and the children.
 6. Each parent shall exert every reasonable effort to maintain free access and unhampered contact between minor children and the other parent.
 7. The plaintiff and the defendant each acknowledge and agree that each is a fit and proper person to have the care, custody and control of the minor children.
The defendant filed a motion to modify custody dated January CT Page 11642 7, 1998 coded 139 seeking sole custody of the two children. The parties entered into an agreement dated February 10, 1998 coded #143 that was approved by the court on February 10, 1998. That agreement provided in part that pending the wife obtaining a three bedroom residence, the father shall have temporary physical custody of the two children. The mother shall have reasonable liberal and flexible visitation and telephone access to the children. The children shall have telephone access with their mother. The matter was also referred to family services. On July 24, 1998 the parties entered into an agreement coded #154 that was approved on July 24, 1998. That agreement provided as follows:
 1. Temporarily and without prejudice to pending contempt and modification motions, the plaintiff mother's visitation with the minor child William (b. 7-10-86) shall occur once a week at a therapy session with mother, son and Dr. Stableford or a member of his staff. Defendant father will co-operate with scheduling and transportation.
 2. Plaintiff mother will not inhibit the daughter Kristen's contact with the defendant father.
 3. Each parent will allow the other reasonable telephone contact with the children at reasonable times (between 8 a.m and 9 p.m.) And will not inhibit the children from calling the other parent.
 4. Neither parent shall discuss with the children, or in the children's presence, this litigation or where the children are to live.
The defendant's motion to modify custody coded #139 as revised by motion dated September 18, 1998 seeks an order of sole, legal and physical custody of the two children. The plaintiff's motion for modification coded #144.50 as revised by amendment dated September 4, 1998 seeks and order of joint legal custody of the two minor children with physical custody with the plaintiff.
The court finds the following additional facts.
A. GENERAL
After the matter was referred to family services on February CT Page 11643 10, 1998 each party filled out an evaluation questionnaire. The plaintiff's evaluation questionnaire was completed on March 26, 1998. As of that date the plaintiff was residing with John Borrelli.
On June 19, 1998 the family relations officer met with Mr. Borrelli. The family relations officer also spoke with Mr. Borrelli by telephone on July 6, 1998. During the June 19, 1998 meeting Mr. Borrelli informed the family relation's officer that he knew both the plaintiff and the defendant and was aware of conflicts between them. He stated that he was building a home for the plaintiff and the two minor children. He indicated at the first meeting that the plaintiff was a very good mother and cared for the children. Mr. Borrelli also stated that the plaintiff had not returned the children to the defendant. During the July 6, 1998 telephone conference Mr. Borrelli said that there had been a change of circumstances and that the plaintiff and the two children were not residing with him. He stated the plaintiff was not around to care for the children and that he Mr. Borrelli had lied during the initial conference with the family relation's officer.
During the course of the trial Mr. Borrelli was called as a witness for the plaintiff and contradicted the testimony of the family relation's officer regarding statements made by him to the family relations officer. The best that can be said for Mr. Borrelli's testimony was that he was not credible.
At the present time B.J. is residing with the defendant and Kristen is residing with the plaintiff. Both children went to live with the defendant the day after Thanksgiving 1997 at the request of the plaintiffs. She had been asking the defendant to have the children move in with him for approximately 1 month earlier, stating that she was unable to handle the children. The children had been split up by the plaintiff on a prior occasion for approximately 6 to 7 months in 1994 or 1995 with Kristen going to live with a friend and B.J. with his grandparents. The defendant learned of this through a friend. Although he requested to do so, the defendant was unable to visit with the children for approximately 3 to 4 months after they had been split up. In applying the best interest of the child's standard to determine custody, the test is not which parent was the better custodian in the past but which is the better custodian now. The court, however, must take into account the parent's past behavior, since it must evaluate their present and future parenting ability and CT Page 11644 the consistency of their parenting for the purpose of determining which parent will better foster their children's growth, development and well being.
As usually occurs in cases of this nature, there was conflicting testimony between the parties and issues of credibility. Part of the testimony of the plaintiff on September 9, 1998 was as follows:
 Having been duly sworn was examined and testified as follows:
DIRECT EXAMINATION BY MS. DOODY
* * *
 Q Now, were there any times during February, March, April and May, okay, that you exhusband did not allow you your court ordered visitation?
A There were, there were times, yes.
Q Do you recall how many times there were?
A I don't recall.
 Q Do you recall any particular incidents when he refused you your court ordered visitation during February, March, April and May?
 A There were incidents. but I don't remember the dates. I have everything written down as far as dates. I kept records of everything.
Q do you need a moment to refresh your recollection?
A Yes.
Q Can you do it quickly, or —
A Yes. You're saying, excuse me, in February —
 Q In February, March, April and May, were there any problems with the court ordered visitations in terms of not being allowed? CT Page 11645
 A There is so many dates, I — it's hard for me to remember each date. Um — Is there any more specific time then through those months?
 MS. LYONS: Objection, Your Honor, the question's asked —
THE WITNESS: I can't — Excuse me?
MS. DOODY: Perhaps we can move on.
 THE COURT: Well, I'm sorry, do you have in your book any dates between March and May when the defendant did not allow you your court ordered visitation?
 THE WITNESS: Yes. I had scheduled doctors appointments. I was not allowed to see him. Um —
 MS. LYONS: Objection, Your Honor, that is not visitation. The question was with regard to visitation and that is not visitation.
 THE COURT: Sustained. The visitation order, as I look at the February 10, 1998 order, in addition to telephone contact, which you've talked about, gave you visitation at least one day during the week from after school until 8:30 p.m. upon 24 hours notice, and every other weekend from Friday at, I'm not sure if it's 5:00 p.m. or 5:10 p.m., until Sunday at 5:00 p.m.. Were there any weeks in which you did not receive at least one day visitation after school until 8:30 p.m. upon 24 hours notice?
 THE WITNESS: Yes, there was. I just don't recall the exact dates.
 THE COURT: Do you have in your book any dates in which you did not have that week day visitation upon 24 hours notice.
THE WITNESS: April, the second week of April.
 THE COURT: And tell me what happened the second week of April. CT Page 11646
 THE WITNESS: BJ, it was the, um, right prior to his, BJ's biopsy in April, I wasn't allowed to see him. And also the phone calls, I never was able —
 THE COURT: Phone calls, we'll hear testimony later. And is that reference regarding the second week of April in the book that you're looking at?
THE WITNESS: Yes.
 THE COURT: In addition, were there any other week days during the week in which you were not allowed at least one visitation between the hours of after school until 8:30 p.m. upon 24 hours notice?
 THE WITNESS: It was basically the week after the incident of BJ's neck. Um, it was mostly in May.
THE COURT: Does your book —
THE WITNESS: Yes.
THE COURT: — give the weeks?
THE WITNESS: Yes. The first week of May.
 MS. LYONS: Your Honor, I have to object to this testimony. First of all, there is a motion pending regarding this time period for visitation. I believe —
 THE COURT: Doesn't have to be, there are custody motions pending, and part of what the Court looks at was custody motions as to what extent one parent is fostering a relationship with the other parent —
MS LYONS: Okay.
 THE COURT: — and to the extent that one parent or the other may or may not be complying with court orders, that's relevant. The objection is overruled.
MS. LYONS: That's fine, Your Honor.
 THE COURT: In addition to the first week of May — Is the incident of your not having a chance to seeCT Page 11647 BJ during the first week of May written into your book?
 THE WITNESS: I have written down the date of BJ's accident and after that is when the incident took place, yes.
THE COURT: Is it written into your book?
THE WITNESS: Yes.
 THE COURT: Was there any other weekdays in which you did not get any visitation at all during the week from after school until 8:30 p.m. upon 24 hours notice, between the months of February and May, 1998?
 THE WITNESS: The, one, two — Which week is this? Ah, second week of May. The third week of May.
 THE COURT: Did you see BJ all during the week, the third week of May?
THE WITNESS: Not as far as visitation, no.
 THE COURT: And is that notation of not seeing him during the third week of May referred to in your book?
 THE WITNESS: Yes. that's when we had school meetings or BJ's incidents.
 THE COURT: Were there any other week days in which you did not get your court ordered visitation during — between the months of February and May, 1998?
 THE WITNESS: I, I think that's if for — through that time frame.
 THE COURT: Next I want to go into weekends, the court order and agreement entered into between you and the defendant of February 10, 1998, provided for visitation with BJ every other weekend from Friday at 5:00 p.m. until Sunday at 5:00 p.m.. Were there any weekends when you did not get visitation with BJ between Friday and Sunday?
THE WITNESS: Yes. CT Page 11648
THE COURT: Tell me what weekends they were.
 THE WITNESS: Um, the visitations from after July 11th forward to this date.
 MS LYONS: Objection, Your Honor, I thought that wasn't the question.
 COURT: It wasn't, but it still is going to — You're actually right, it wasn't, but I'm going to allow it anyway because otherwise it's going to come in.
 My question though ma'am, is between the period of, which was, I'm using the dates that your attorney used, between February, 1998 and May, 1998. were there any times in which you did not get your every other weekend visitation?
THE WITNESS:Yes.
THE COURT: Tell me what weekends they were?
 THE WITNESS: Oh, boy. Um — I believe it was the weekend of, um, April 7th.
 THE COURT: In addition to the weekend of April 7th, were there any other weekends that you did not have visitation with BJ between February and May, 1998?
 THE WITNESS: I, I don't have any other notes as far as another weekend. There were a couple. I'm not sure of, of the weekends.
 THE COURT: Is the weekend of April 7, 1998, referred to in your book as a weekend that you did not get visitation with BJ?
THE WITNESS: Excuse me, April 7th did you say?
THE COURT: That's what you said.
 THE WITNESS: Oh, I didn't hear what you were saying.
 THE COURT: All right. You said that you did not get your weekend visitation with BJ on the weekend of April 7,
CT Page 11649 1998, is that, is that your testimony?
 THE WITNESS: I just — I thought I just said on the weekend of May
THE COURT: Was it the weekend of —
THE WITNESS: It was —
 THE COURT: — May 7, 1998, that you did not get the week visitation with BJ, or April 7, 1998?
 THE WITNESS: One, one moment, I might be confusing myself, hold on. No, I'm sorry, Your Honor, it is April.
 THE COURT: Was it the weekend of April 7, 1998, that you did not get you weekend visitation with BJ?
 THE WITNESS: It was the weekend of April 5th. It was, um, 3, 4, and 5 of April.
 THE COURT: Is there a reference in your calendar book to your not getting visitation that weekend?
THE WITNESS: Yes, it was before Easter.
THE COURT: Is there any reference in your —
THE WITNESS: Yes.
THE COURT: — calendar book —
THE WITNESS: Yes. I —
THE COURT: — of not getting visitation on that weekend?
 THE WITNESS: I said yes. but you can't hear me. Sorry.
 THE COURT: Any counsel have any objection if the witness shows me her calendar book regarding the second week in April notation, the first week in May notation, the third week in May notation, as they relate to week day visitation and the weekend of April 3, 4, and 5, 1998, CT Page 11650 regarding the weekend visitation?
MR. WALLACE: I have no objection, Your Honor.
 MS. LYONS: I have no objection. Obviously it's self-serving. I don't what it proves, but.
MS DOODY: I don't have any objection, Your Honor.
 THE COURT: Could you show me in your calendar book, ma'am, what you have written down for the second week of April 1998?
 THE WITNESS: Excuse me, Your Honor, I didn't know that you were asking me for an exact writing in my book.
 THE COURT: I think I asked the question fairly clearly. I asked was there a written notation in your calendar book regarding not having visitation for the dates you testified to.
 Now, my question is, please show me in your calendar book where there is a reference in that book for the second week in April, 1998, for not seeing BJ during that week, is there anything in your book that says so?
 THE WITNESS: I'm sorry, I misunderstood your question. I —
 THE COURT: Is there anything in your book that says you did not see BJ during the second week of April, 1998?
 THE WITNESS: I have not found that right here. I just did it from memory.
 THE COURT: Is there anything in your book that says you did not see BJ in the first week of May, 1998, during that week?
 THE WITNESS: I did not exactly write it down. I didn't — 
THE COURT: Did you inexactly write it down?
CT Page 11651
 THE WITNESS: I misunderstood your question when you asked me.
 THE COURT: Is there anything in your book saying that you did not see BJ during the first week of May, 1998?
THE WITNESS: No. I did not write that down.
 THE COURT: Is there anything in your book saying that you did not see BJ during the third week of May, 1938?
THE WITNESS: No.
 THE COURT: Is there anything in your book saying that you did not see BJ for the three day weekend of April 3, 4 and 5, 1998?
 THE WITNESS: I. I did not write every single thing down. I'm — I cannot find it.
 THE COURT: Is there anything in your book saying that you did not see BJ during the weekend of April 3, 4 and 5, 1998?
THE WITNESS: Not that I can find.
 THE COURT: You may proceed with direct examination, counsel.
* * *
(Emphasis provided)
The parties are in dispute as to whether the plaintiff told the defendant that she was unable to handle the children. The court finds that she did make such a representation to the defendant. The plaintiff claims that B.J. is scared to live with the defendant. The court finds that claim is not credible. The plaintiff claims that she was unable to speak to B.J. by telephone. The court finds that claim is not credible. The plaintiff claims that the defendant always gave permission for the children to remain with her additional evenings over and above her court allowed visitation. The court finds that claim is not credible. The plaintiff claims that following an incident with B.J. riding his quad vehicle in June 1998 that she believed CT Page 11652 that he would be in danger if he was allowed to return to reside with the defendant. The court finds the claim is not credible. The plaintiff claims that during the period between June and early July that B.J. was living with her that it was with the defendant's agreement. The court finds that claim is not credible.
If required to live with the defendant Kristen would probably run away from home. Kristen does not want to live with the defendant because his home is much more regimented. She has a close relationship with the plaintiff. Kristen has been living with the plaintiff since approximately May 15, 1998. Prior to the time Kristen moved back to live with the plaintiff, the defendant had her in counseling. After she moved Kristen moved back with the plaintiff, the plaintiff told her that she did not have to continue counseling and stopped it altogether. The plaintiff claims that the defendant stated that he did not care where Kristen was at. The court finds that claim is not credible.
B.J. had a heart transplant in 1993. He is affected by the stress that exists between the plaintiff and the defendant. On April 1998 B.J. was injured. He had been on the couch watching a movie. The defendant had told him that it was time for him to take his heart medication. He did not respond and the defendant's present wife grabbed him and scratched him. The scratching of B.J. was accidental. The incident was referred to DCF and DCF did not have any concerns regarding the incident and closed their file within 10 days from the referral. B.J. needs medication on a daily basis and regular checkups due to his heart condition. He takes some medication four times daily and also takes antirejection medication every 12 hours. B.J. has been residing with the defendant since the day after Thanksgiving 1997. The defendant's wife is a very stabilized influence on B.J.'s life. He had been diagnosed with having major depressive disorder. He has anxiety and sleep problems and problems dealing with his heart condition. His therapist has recommended that he have significant contact with both parents. His heart transplant was in November 1993. B.J. will have less stress living with the defendant than he would if he was living with the plaintiff. At the present time B.J. is attending a special needs school in East Haven, Connecticut. The defendant agreed to B.J. enrolling in the special needs school, but the plaintiff did not. She went to the school and said she objected to having her son there. She claimed that it was a school for crazies and retards. B.J. was aware of the fact that the plaintiff felt that he did not belong at the CT Page 11653 school as the plaintiff had told him that. The Pathway School that B.J. attends is a school for children with emotional problems. He has been there since May of June of 1998 and is doing very good at that school. That school has been appropriate for B.J. After B.J. visits with the plaintiff his attitude changes and he talks back to the defendant and the defendant's present wife. At the present time B.J. is in individual therapy and is also in family therapy with the defendant and his present wife. During the period of early June 1998 until on or about July 10, 1998, B.J. was with the plaintiff and she refused to allow him to return to the defendant. He was returned to the defendant by the plaintiff's brother on the weekend of his birthday on July 10, 1998. During a period of time that the plaintiff refused to allow B.J. to return to the defendant in violation of existing court orders, the defendant would arrange to turn over to the plaintiff the medication that B.J. needed. The plaintiff did not require B.J. to take all of his medication on a timely basis. The plaintiff has taken B.J. to be treated by a chiropractor although his cardiologist has recommended that he not be treated by a chiropractor. The defendant presently provides health insurance for B.J. and Kristen. The health insurance for the children is through the defendant's wife's employment. Both children have been on Title XIX for health insurance since 1996.
It is the recommendation of the family relation's officer that an order of joint legal custody should be entered with Kristen residing with the plaintiff and B.J. residing with the defendant. The family relation's officer also recommended that the plaintiff have visitation with B.J. on either Saturday or Sunday for approximately 8 to 10 hours between the hours of 11:00 a.m. and 6:00 to 7:00 p.m. as well as sometime on Wednesday evenings. He also recommended that the defendant have reasonable and liberal visitation with Kristen.
The parties entered into an agreement coded #143 that was approved by the court on February 10, 1998. Under that agreement the children were to be in the custody of the defendant and the plaintiff was to have reasonable, liberal and flexible visitation and telephone access to the children. She was to have visitation at least one day a week. The plaintiff has filed a motion for contempt coded 144 alleging that the defendant has not complied with the orders of February 10, 1998 in that he has not allowed reasonable telephone access between the mother and the children and he has not allowed visitation more than one day per week. The court finds that the plaintiff has failed to prove those CT Page 11654 allegations and therefore does not hold the defendant in contempt.
The defendant has filed a motion for contempt coded 146 arising out of the orders of February 10, 1998 alleging that the plaintiff has refused to return the children to the custody of the defendant in violation of that order. During June, 1998 on many occasions the defendant talked to the plaintiff regarding her failure to return the children. The plaintiff told him that the court order was a piece of paper and means nothing. The court finds that the plaintiff is in contempt of court in that she refused to return the children to the defendant between the period of early June 1998 until on or about July 10, 1998. The court finds that the plaintiff's reasons for failing to return the children are not credible. The court finds that the plaintiff did not have any reasonable basis for failing to return the children to the defendant between early June 1998 until on or about July 10, 1998. The court therefore finds that the plaintiff is in contempt of court regarding the order entered coded #143.
The defendant has filed a motion to suspend visitation coded 151. After that motion was filed the parties entered into an agreement coded 154 for the plaintiff's visitation with the minor child B.J. to occur once a week at a therapy session with the plaintiff and B.J. and Dr. Stableford or member of his staff. The court finds that it is not in B.J.'s best interest to suspend his visitation with the plaintiff and therefore denies that motion. The court finds that it is in B.J.'s best interest to vacate the order coded #154 and therefore vacates that order.
The plaintiff has filed a motion for contempt coded 152. The court finds that in view of the actions of the plaintiff in failing to return B.J. to the defendant between June 1998 until on or about July 10, 1998 that the actions of the defendant were reasonable under the circumstances in not allowing the plaintiff to have unsupervised visitation until the agreement was entered between the parties on July 24, 1998 providing for visitation between the plaintiff and B.J. once a week at a therapy session. The court therefore denies the plaintiff's motion for contempt.
Counsel for the minor children has requested that his fee be paid under his motion coded #153. The court finds that the reasonable fee incurred by him in these proceedings amounts to $4,656.25. The court orders that that fee be split equally between the parties. CT Page 11655
In determining the defendant's motion to modify custody coded #139 and the plaintiff's motion to modify custody coded #144.50 this court has considered the provision of Section 46(b)-56 and the provision of Section 44(b)-56a. The court enters the following orders regarding the motions coded #139 and #144.50:
A. Regarding Kristen.
1. An order of joint legal custody is entered regarding Kristen with primary residence with the plaintiff.
2. The defendant is awarded reasonable and liberal visitation rights with Kristen.
3. The defendant is to pick up and return the child at the plaintiff's residence.
4. Except in the case of emergency, the defendant is not to bring Kristen to any physician for any treatment.
B. Regarding B.J.
1. The defendant is awarded sole custody of B.J.
2. The plaintiff is awarded visitation with B.J. on Sunday from 9:00 a.m. to 5:00 p.m. She is also granted visitation on Wednesday from 4:00 p.m. to 7:00 p.m.
3. The plaintiff is to pick up and return the child at the defendant's residence.
4. The plaintiff shall not come to the residence of the defendant unannounced and shall not be permitted to approach or speak to B.J. while he is at school.
5. The plaintiff is not to bring B.J. to any chiropractor for treatment. Further, except in the case of any emergency, she is not to bring B.J. to any physician for any treatment.
6. The defendant is to notify the plaintiff of any inpatient or outpatient hospitalization of B.J. The plaintiff has the right to be present at any such hospitalization.
The court entered the following orders regarding attorneys' CT Page 11656 fees:
1. The court awards counsel fees to counsel for the defendant in the amount of $100.00 regarding the plaintiff's motion for contempt coded #144. The court awards counsel fees to counsel for the defendant regarding the defendant's motion for contempt coded #146 in the amount of $500.00. The court awards counsel fees for counsel for the defendant regarding the plaintiff's motion for contempt coded #152 in the amount of $100.00. The court orders that the above counsel fees be paid at the rate of $50.00 per week commencing October 22, 1998.
2. The court orders that the defendant pay his share of $2,328.00 counsel fees to counsel for the minor children at the rate of $50.00 per week commencing October 22, 1998. The court orders that the plaintiff pay her share of $2,328.00 to counsel for the minor children at the rate of $50.00 per week commencing February 4, 1999.
Axelrod, J.